Filed 9/12/17

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE


| | |
|---|---|
| JOEY MILLER, | B271214 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. LC098458) |
| v. | |
| FORTUNE COMMERCIAL CORPORATON et al., | |
| Defendants and Respondents. | |


APPEAL from a judgment of the Superior Court of Los Angeles County, Russell S. Kussman, Judge.  Affirmed.

Litigation & Advocacy Group and Glenn A. Murphy for Plaintiff and Appellant.

Weintraub Tobin Chediak Coleman Grodin, Zachary Smith and Brendan J. Begley for Defendants and Respondents Fortune Commercial Corporation et al.

Green & Marker and Richard A. Marker for Defendant and Respondent We Service America, Inc.

———————————

Joey Miller (Miller) sued defendant Fortune Commercial Corporation, the owner and operator of a chain of Seafood City markets, and several other defendants (collectively, Defendants), because, allegedly, they illegally denied him service when he tried to enter two different Seafood City stores with his service dog. Miller alleged three causes of action: violation of the Unruh Civil Rights Act (Civ. Code, § 51 et seq. (Unruh Act)[1]); violation of the Disabled Persons Act (§ 54 et seq. (DPA)); and intentional infliction of emotional distress. Defendants moved for summary judgment arguing principally that Miller's dog was not a fully trained service animal at the time of the alleged incidents, that Miller did not bring his dog to the markets for the purpose of training her, and that in any event neither Miller, who suffers from a disability, nor his stepfather who accompanied him to the markets, were, respectively, capable or authorized to train a service dog. The trial court granted Defendants' motion.

On appeal, Miller argues that, at the time of the alleged incidents, his dog Roxy had received, not only obedience training, but also some meaningful training as a service animal—that is, Roxy had been trained to respond to

———————————

[1] All further statutory references are to the Civil Code unless otherwise indicated.

certain symptoms of Miller's disability (e.g., Roxy could prevent Miller from wandering away from home and getting lost) and that as a result he was permitted by law to bring Roxy into the markets. In addition, Miller contends that he was permitted by law to take Roxy into Defendants' markets for the purpose of training her further.

We are not persuaded by Miller's arguments. Accordingly, we affirm the judgment.

## BACKGROUND

### I.   Miller and Roxy

In May or early June of 2012, Miller acquired Roxy, a one-year old female mixed-breed (German Shepherd-Labrador Retriever) dog. Miller's stepfather, Joseph Scribner (Scribner), purchased Roxy to be Miller's service dog and thereby help him become "more independent." Miller, who was 20 years old at the time, has an IQ between 50 and 75 suffers from both an "intellectual disability and autism"; these twin conditions allow him to function at only a level "somewhere between a third- to a sixth-grader, or a 9- to 12-year-old" boy.

Scribner purchased Roxy from a "regular pet store." When Scribner purchased Roxy, the dog had received basic obedience training. After acquiring Roxy, Miller and his family worked on training her further to be a service animal; in addition, Miller's family arranged to have an instructor work with Miller and Roxy at a Petco store in June or July 2012 in order to "teach [Miller] how to handle a dog."

3

## II.  Miller and Roxy at Seafood City markets

In August 2012, Scribner took Miller and Roxy to a mall parking lot in North Hills, California.  They were there to purchase a Play Station PSP gaming device for Miller as a "reward" for his "tremendous" improvements with Roxy.  Located at the mall was a Seafood City market.  Before then, Scribner had never been to a Seafood City market; in fact he didn't even know the store existed.  After purchasing the device, Scribner took Miller and Roxy into the Seafood City market to buy some seafood because seafood was one of Miller's favorite foods.  Almost immediately after entering the store, Scribner and Miller were stopped by an employee who told them they could not bring a pet into the store.  Although Miller was "upset" after being asked to leave the store, Scribner discovered that there was another Seafood City market nearby and drove to that store, where "the same thing basically happen[ed]," except that "they were a little nicer at the second [store] than the first one."

## III.  Miller's lawsuit

Miller filed suit in September 2012.  In June 2015, Defendants moved for summary judgment, relying primarily on deposition testimony by Scribner and Miller.  Miller opposed the motion by relying primarily on a postdeposition declaration by Scribner.[2]  Neither side offered any expert

---

[2] Although the trial court found that Scribner's declaration to be "conclusory and unpersuasive" and at odds in many respects with his prior deposition testimony, it overruled Defendants' objections to it.

4

testimony about service animals and their training, generally or with respect to Miller's specific disability.

On September 8, 2015, the trial court, after hearing oral argument from the parties, granted Defendants' motion. On December 11, 2015, the trial court issued a 34-page written ruling and order on the motion. On January 25, 2016, judgment was entered in favor of the Defendants. Miller timely appealed.

## DISCUSSION

### I. Standard of review

"The purpose of the law of summary judgment is to provide courts with a mechanism to cut through the parties' pleadings in order to determine whether, despite their allegations, trial is in fact necessary to resolve their dispute." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843 (*Aguilar*).) Summary judgment is proper only where " 'there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' " (Code Civ. Proc., § 437c, subd. (c); *Aguilar*, at p. 843.)

A defendant seeking summary judgment is required to show that " 'one or more elements of the cause of action . . . cannot be established, or that there is a complete defense to the cause of action.' " (Code Civ. Proc., § 437c, subd. (p)(2); *Aguilar*, *supra*, 25 Cal.4th at p. 849; *Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 768.)

Once the defendant has met his or her threshold requirement, the burden shifts to the plaintiff to show the

5

existence of one or more triable issues of material fact. (Code Civ. Proc., § 437c, subd. (p)(2); *Aguilar*, *supra*, 25 Cal.4th at p. 850.) In order to meet this burden, the plaintiff must " 'set forth the specific facts showing that a triable issue of material fact exists as to that cause of action or a defense thereto.' " (*Aguilar*, at p. 849.) A triable issue of material fact may not be created by speculation or a "stream of conjecture and surmise." (*Dumin v. Owens–Corning Fiberglas Corp.* (1994) 28 Cal.App.4th 650, 656; *Lineaweaver v. Plant Insulation Co.* (1995) 31 Cal.App.4th 1409, 1421.) Instead, the plaintiff must produce "substantial responsive evidence." (*Sangster v. Paetkau* (1998) 68 Cal.App.4th 151, 162–163.)

In considering the evidence submitted by the parties, the trial court does not "weigh the plaintiff's evidence or inferences against the defendants' as though it were sitting as the trier of fact." (*Aguilar*, *supra*, 25 Cal.4th at p. 856.) However, "it must nevertheless determine what any evidence or inference could show or imply to a reasonable trier of fact. . . . In so doing, it does not decide on any finding of its own, but simply decides what finding such a trier of fact could make for itself." (*Ibid.*, fn. & italics omitted.) Where the standard of proof is preponderance of the evidence, if any evidence or inference presented or drawn by the plaintiff shows or implies that the elements of the cause of action were more likely than not satisfied, summary judgment must be denied, because a reasonable trier of fact could find for the plaintiff. Otherwise, there is no triable

issue of material fact, and summary judgment should be granted. (See *id.* at pp. 856–857; see also *Leslie G. v. Perry & Associates* (1996) 43 Cal.App.4th 472, 483.)

We review the trial court's grant of summary judgment de novo, applying the same standards that governed the trial court. (*Zavala v. Arce* (1997) 58 Cal.App.4th 915, 925.) We consider all of the evidence the parties offered in connection with the motion (except any which the court properly excluded) and the uncontradicted inferences the evidence reasonably supports. (*Artiglio v. Corning Inc.* (1998) 18 Cal.4th 604, 612.)

## II. Principles of statutory interpretation

"We begin with the fundamental rule that our primary task is to determine the lawmakers' intent." (*Delaney v. Superior Court* (1990) 50 Cal.3d 785, 798.) "In construing statutes, we aim 'to ascertain the intent of the enacting legislative body so that we may adopt the construction that best effectuates the purpose of the law.' " (*Klein v. United States of America* (2010) 50 Cal.4th 68, 77 (*Klein*).) California courts "have established a process of statutory interpretation to determine legislative intent that may involve up to three steps." (*Alejo v. Torlakson* (2013) 212 Cal.App.4th 768, 786–787 (*Alejo*).) The "key to statutory interpretation is applying the rules of statutory construction in their proper sequence . . . as follows: 'we first look to the plain meaning of the statutory language, then to its legislative history and finally to the reasonableness of a proposed construction.' " (*MacIsaac v. Waste Management*

7

*Collection & Recycling, Inc.* (2005) 134 Cal.App.4th 1076, 1082 (*MacIsaac*).)

"The first step in the interpretive process looks to the words of the statute themselves." (*Alejo, supra,* 212 Cal.App.4th at p. 787; see *Klein, supra,* 50 Cal.4th at p. 77 [" 'statutory language is generally the most reliable indicator of legislative intent' "].)

"If the interpretive question is not resolved in the first step, we proceed to the second step of the inquiry. [Citation.] In this step, courts may 'turn to secondary rules of interpretation, such as maxims of construction, "which serve as aids in the sense that they express familiar insights about conventional language usage." ' [Citation.] We may also look to the legislative history. [Citation.] 'Both the legislative history of the statute and the wider historical circumstances of its enactment may be considered in ascertaining the legislative intent.' [Citation.] [¶] 'If ambiguity remains after resort to secondary rules of construction and to the statute's legislative history, then we must cautiously take the third and final step in the interpretive process. [Citation.] In this phase of the process, we apply "reason, practicality, and common sense to the language at hand." [Citation.] Where an uncertainty exists, we must consider the consequences that will flow from a particular interpretation. [Citation.] Thus, "[i]n determining what the Legislature intended we are bound to consider not only the words used, but also other matters, 'such as context, the object in view, the evils to be remedied,

the history of the times and of legislation upon the same subject, public policy and contemporaneous construction.' [Citation.]" [Citation.] These "other matters" can serve as important guides, because our search for the statute's meaning is not merely an abstract exercise in semantics. To the contrary, courts seek to ascertain the intent of the Legislature for a reason—"to *effectuate the purpose* of the law." ' " (*Alejo, supra,* 212 Cal.App.4th at pp. 787–788; see *MacIsaac, supra,* 134 Cal.App.4th at pp. 1083–1084.)

We do not necessarily engage in all three steps of the analysis. "It is only when the meaning of the words is not clear that courts are required to take a second step and refer to the legislative history." (*Soil v. Superior Court* (1997) 55 Cal.App.4th 872, 875.) "If ambiguity remains after resort to secondary rules of construction and to the statute's legislative history, then we must cautiously take the third and final step in the interpretative process." (*MacIsaac, supra,* 134 Cal.App.4th at p. 1084.)

## III. Defendants were entitled to judgment as a matter of law on the Unruh Act claim

### A. THE UNRUH ACT AND SERVICE DOGS

The Unruh Act broadly outlaws arbitrary discrimination in public accommodations and includes disability as one among many prohibited bases. (§ 51, subd. (b).) As part of the 1992 reformation of state disability law, the Legislature amended the Unruh Act to incorporate by reference the federal Americans with Disabilities Act of 1990 (42 U.S.C. § 12101 et seq.; (ADA)), making violations of

9

the ADA per se violations of the Unruh Act.  (§ 51, subd. (f); *Munson v. Del Taco, Inc.* (2009) 46 Cal.4th 661, 668–669 (*Munson*).)  The ADA, like the Unruh Act, prohibits discrimination on the basis of disability in the enjoyment of public accommodations.  (42 U.S.C. § 12182.)

Although the Unruh Act does not expressly address service dogs, the ADA's accompanying regulations do.[3] "Service animal means any dog that is individually trained to do work or perform tasks for the benefit of an individual

---

[3] In relying on a federal statute for our analysis, we are mindful of the differences between the ADA and the Unruh Act.  (*Munson*, *supra*, 46 Cal.4th at p. 669.)  However, where, as here, the issue is discrimination, California courts routinely look to federal statutes, regulations, and case law for guidance.  For example, as our Supreme Court has stated in the context of employment discrimination, "[b]ecause of the similarity between state and federal employment discrimination laws, California courts look to pertinent federal precedent when applying our own statutes."  (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 354.)  Moreover, where federal courts have addressed discrimination issues that California courts have yet to consider, those federal decisions "provide substantial guidance."  (*Gelfo v. Lockheed Martin Corp.* (2006) 140 Cal.App.4th 34, 55.)  In addition, as our Supreme Court has noted, " 'conformity [to the ADA rules] will benefit employers and businesses because they will have one set of standards with which they must comply in order to be certain that they do not violate the rights of individuals with physical or mental disabilities.' "  (*Green v. State of California* (2007) 42 Cal.4th 254, 263.)

10

with a disability, including a physical, sensory, psychiatric, intellectual, or other mental disability.  Other species of animals, whether wild or domestic, trained or untrained, are not service animals for the purposes of this definition.  The work or tasks performed by a service animal must be directly related to the individual's disability. . . .  The crime deterrent effects of an animal's presence and the provision of emotional support, well-being, comfort, or companionship do not constitute work or tasks for the purposes of this definition."  (28 C.F.R. § 36.104.[4])

The ADA regulation notably uses the past tense in describing a service dog—"trained."  In other words, the language of the ADA regulation indicates that a dog that is in the process of being trained as a service animal, but whose training has not yet been completed, cannot yet be considered a service animal.[5]  This interpretation is

---

[4] The ADA's definition of a "service animal" conforms rather closely with the Penal Code's definition of a "service dog":  " 'service dog' means any dog individually trained to do work or perform tasks for the benefit of an individual with a disability, including, but not limited to, minimal protection work, rescue work, pulling a wheelchair, or fetching dropped items."  (Pen. Code, § 365.5, subd. (f).)

[5] To "train" someone or something means "to teach or exercise (someone) in an art, profession trade or occupation; direct in attaining a skill:  give instruction to."  (Webster's Third New International Dict. (2002) p. 2424, col. 2.)  Consequently, when someone or something has been

11

supported by recent case law, *Davis v. Ma* (C.D. Cal. 2012) 848 F.Supp.2d 1105. In that case, the defendant restaurant, a Burger King, denied the plaintiff customer service because he had a puppy with him. The customer, alleging among other things, a violation of the ADA and intentional infliction of emotional distress, sued the restaurant, claiming that he was in the process of training the puppy to be a service animal: the puppy, which had a service dog tag on the day of the incident, "was not fully trained as a service animal, but had some 'basic obedience' training." (*Id*. at p. 1110.) The federal district court granted summary judgment to the restaurant, because at the time of the incident the puppy was "not a trained service dog . . . under any circumstances according to minimal industry standards and practices" and plaintiff was "not a certified service dog trainer based on industry standards." (*Id*. at pp. 1111, 1114–1115.)

In 2015, the United States Department of Justice published a set of answers to frequently asked questions about service animals. With regard to whether "service-animals-in-training" can be considered service animals under the ADA, the Department of Justice answered, "No. Under the ADA, *the dog must already be trained before it can be taken into public places*." (U.S. Department of Justice, Civil Rights Division, Disability Rights Section "Frequently

"trained"—that is, their training has been completed—they are now qualified to act or perform in a certain way.

Asked Questions about Service Animals and the ADA," p. 2, at <https://www.ada.gov/regs2010/service_animal_qa.html> [as of August 28, 2017], italics added.)

Accordingly, we hold that the Unruh Act prohibits arbitrary discrimination in public accommodations with respect to trained service dogs, but not to service-dogs-in-training.[6]

B. MILLER FAILED TO MEET HIS EVIDENTIARY BURDEN

Defendants met their threshold burden with regard to the Unruh Act claim by showing that in August 2012, Roxy was not a fully trained service dog. Specifically, Defendants pointed to Miller's concession earlier in the litigation that, at all relevant times, Roxy "wasn't fully trained" and still "in the process of being trained." In opposition to Defendant's motion, Miller offered evidence that Roxy had received some training as a service dog, in addition to her basic obedience training. However, Miller did not offer any evidence, let alone substantial evidence, that Roxy was a fully trained service animal in August 2012. In the absence of such evidence, Defendants were entitled to judgment as a matter of law on Miller's Unruh Act claim.

---

[6] On appeal, Miller argues that "[t]here is a very significant difference between a dog that is not *fully trained* and one that is not *trained-at-all*." While that may be true, it is irrelevant under the ADA and, by extension, the Unruh Act.

## IV. Defendants were entitled to judgment as a matter of law on the DPA claim

### A. THE DPA AND SERVICE DOGS

The DPA substantially overlaps with and complements the Unruh Act. (*Munson*, *supra*, 46 Cal.4th at p. 675.) More narrow in focus than the Unruh Act, it generally guarantees people with disabilities equal rights of access "to public places, buildings, facilities and services, as well as common carriers, housing and places of public accommodation." (*Id.* at p. 674, fn. 8; see §§ 54, subd. (a), 54.1, subd. (a)(1).) As with the Unruh Act, the Legislature amended the DPA to incorporate ADA violations and make them a basis for relief under the act. (§§ 54, subd. (c), 54.1, subd. (d); *Munson*, at p. 674.)

Unlike the Unruh Act, however, the DPA does expressly address service animals. Specifically, the DPA identifies three types of service animal: guide dogs for the blind; signal dogs for the deaf; and service dogs for other disabled persons, each of which must be "especially trained" for their purpose. (§ 54.2, subd. (a).)

Unlike the ADA, the DPA extends its protections to disabled persons whose service animals are still in the process of being trained. The act specifically provides that a service animal who is in the process of being trained may be taken into a place of public accommodation for the purpose of furthering their training: "Individuals who are blind or otherwise visually impaired and persons *licensed* to train guide dogs for individuals who are blind or visually

14

impaired . . . and individuals who are deaf or hearing impaired and persons *authorized* to train signal dogs for individuals who are deaf or hearing impaired, and individuals with a disability and persons who are *authorized* to train service dogs for the individuals with a disability may take dogs, *for the purpose of training them* as guide dogs, signal dogs, or service dogs in any of the places specified in Section 54.1 without being required to pay an extra charge or security deposit for the guide dog, signal dog, or service dog."  (§§54.2, subd. (b); 54.1, subd. (c).[7])

In short, with regard to the issue of training, the DPA recognizes three categories of people who are permitted to bring a service animal who is in the process of being trained into an establishment for the purpose of furthering that training:  the disabled person; persons "licensed" to train guide dogs; and persons "authorized" to train either signal dogs or service dogs.  Although the DPA defines what it means to be a person licensed to train guide dogs (see § 54.1, subd. (b)(6)(C)(i); see also Bus. & Prof. Code, §§ 7209–7210, 7211–7211.1), it does not define who is authorized to train signal dogs or service dogs.  (See § 54.1, subd. (b)(6)(C)(ii)-(iii).)

---

[7] The Penal Code similarly provides that "[a]ny trainer or individual with a disability may take dogs in any of the places specified in subdivisions (a) and (b) for the purpose of training the dogs as guide dogs, signal dogs, or service dogs." (Pen. Code, § 365.5, subd. (i).)

15

In the proceedings below, Miller argued that a "person authorized to train service dogs" means any person authorized by the disabled person to train his or her dog, including someone such as Miller's stepfather and guardian ad litem, Scribner. While this interpretation is somewhat consistent with the general meaning of "authorize,"[8] it is entirely inconsistent with the manifest intent of the statute, which is to allow service-animals-in-training to complete their training in a such a way that it does not jeopardize other public policy goals, such as public health. In other words, under Miller's interpretation, a disabled person could authorize someone to bring a service-animal-in-training into a restaurant or food market who not only lacks the training and experience to train a service dog, but who is also reckless with regard to the health and safety of others. Such an interpretation would make a mockery of the statute, especially in light of the DPA's requirement that a guide dog must be trained by a licensed professional trainer. (§§ 54.1, subd. (c), 54.2, subd. (b).) The guide dog provision, when read in conjunction with the less demanding but similar provisions for trainers of signal dogs and service dogs (§§ 54.1, subd. (c), 54.2, subd. (b)), indicates that the

---

[8] "[A]uthorize: to endorse, empower, justify or permit by or as if by some recognized or proper authority." (Merriam-Webster Unabridged Dict. (merriam-webster.com); accord Black's Law Dict. (9th ed. 2009), p. 153, col. 2 ["give legal authority; to empower . . . formally approve; to sanction"].)

16

authority which allows someone to train a signal dog or a service dog must be found in his or her credentialing broadly conceived. As our Supreme Court has stated, "when interpreting a statute, we must harmonize its various parts if possible, reconciling them in the manner that best carries out the overriding purpose of the legislation." (*Elsner v. Uveges* (2004) 34 Cal.4th 915, 933.) "Related provisions 'should be read together and construed in a manner that gives effect to each, yet does not lead to disharmony with the others.' " (*Bighorn–Desert View Water Agency v. Verjil* (2006) 39 Cal.4th 205, 218.)

Consequently, based on the language and structure of the DPA, we hold that while the Legislature intended that a person who trains service dogs need not be licensed, he or she nonetheless must have some other enabling authority to engage in such training. Accordingly, we hold that "persons authorized to train service dogs" means any person who is credentialed to do so by virtue of their education or experience.

B.     MILLER FAILED TO MEET HIS EVIDENTIARY BURDEN

Under the DPA, either Miller or an authorized trainer was allowed to take Roxy into a Seafood City market "for the purpose of training" her. (§§ 54.1, subd. (c), 54.2, subd. (b).)

Defendants met their threshold burden by presenting evidence that Roxy was not taken to the Seafood City markets for purposes of training by either Miller or his stepfather or guardian ad litem, Scribner, by citing, among other things, to Scribner's deposition testimony that the trip

17

to the market was a spur-of-the-moment decision to purchase seafood.

Miller, however, failed to produce substantial evidence that Roxy was taken to the Seafood City markets for the purpose of training. First, Scribner conceded that he himself did not enter the markets to train Roxy; he went in only to purchase seafood; and, moreover, Miller and Roxy were not with him in the markets. Second, although Scribner stated in his declaration that he brought Miller and Roxy into the market so that they could "continue the dog's training," Miller did not produce evidence that he was capable of training Roxy as a service dog on his own. Indeed, the evidence suggests just the opposite.

At the time, Miller had owned Roxy for approximately two months. Moreover, Miller's mental capacity at the time was that of a sixth or seventh grader. In fact, Scribner joined the litigation precisely because of Miller's limited mental capacity—in his declaration supporting his application to be appointed Miller's guardian ad litem, Scribner stated: "Joey's disabilities cause him to get easily confused about *anything the least bit complicated*." In addition, Miller did not present any evidence that before getting Roxy, he had ever trained any other dog or other animal, let alone trained a dog to be a service animal. Miller also did not present any evidence on what role he played in Roxy's training prior to entering the Seafood City markets. Scribner, in his declaration, stated that what progress had been made in training Roxy to be a service animal in the

short time that they had her had been accomplished with other members of the family and with the assistance of a "professional dog trainer."

While there is a presumption under California law that the mere diagnosis of a mental disorder is not "sufficient in and of itself to support a determination that a person . . . lacks the capacity to do a certain act" (Prob. Code, § 811, subd. (d)), that presumption is a rebuttable one. (Prob. Code, § 811, subd. (a).) Although Defendants presented evidence Miller was not capable of training Roxy to be his service animal, Miller, in turn, did not present substantial admissible evidence that he had at the relevant time the capacity to train Roxy without any assistance from others.

Based on the evidence presented and the reasonable inferences following therefrom, a reasonable trier of fact would not find that it was more likely than not Miller entered the Seafood City markets for the purpose of training Roxy as a service dog with no assistance from anyone else. (*Aguilar*, *supra*, 25 Cal.4th at p. 856.)

Assuming arguendo that Scribner, contrary to his declaration, did enter the Seafood City markets for the purpose of training Roxy and not solely to buy seafood, Miller failed to produce substantial evidence that Scribner, was, by virtue of his education or experience, authorized to train Roxy as a service dog. Although he offered testimony that Scribner had some qualities that would allow him to train Roxy (as his stepfather, Scribner, unlike other trainers

19

would be able to "recognize symptoms of [Miller's] mental disability"), Miller did not offer any evidence regarding Scribner's education or experience as a trainer of service animals. Nor did Miller offer any documentary evidence (such as certificates from training academies or testimonials from others attesting to his skill and dedication as an animal trainer) showing that Scribner was competent to train a service animal. In addition, Miller offered no evidence that Scribner's methods as a trainer of service animals were consistent with protocols and practices accepted within the service-dog-training industry or community.

In the absence of substantial evidence showing that Miller visited the Seafood City markets for training purposes, that Miller had the ability to train a service animal to respond to his specific disability, and that Scribner was authorized by his education or experience to train service animals including those that can respond to his stepson's disability, the defendants were entitled to judgment as a matter of law on Miller's DPA claim.

## V. Defendants were entitled to judgment as a matter of law on the emotional distress claims

" 'The elements of a prima facie case for the tort of intentional infliction of emotional distress are: (1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's

20

outrageous conduct.  [Citations.] . . . Conduct to be outrageous must be so extreme as to exceed all bounds of that usually tolerated in a civilized community.' " (*Wilson v. Hynek* (2012) 207 Cal.App.4th 999, 1009.)

Here, Defendants met their threshold burden by, among other things, presenting evidence that Seafood City had since at least 2011 a company policy against discriminating against people who bring their service animals to the store and that, as a result, there was no evidence that the Defendants intended to cause Miller any emotional distress.  In response, Miller, based upon the deposition testimony of one of the individual defendant-employees who testified that he had never received any training from Seafood City about service dogs, argued that due to Seafood City's failure to train its employees "no such policy actually exist[ed]."

However, as Miller concedes, his emotional distress claim is premised on Defendants' violation of the Unruh Act and/or the DPA—that is, if no such violation occurred, then there was no extreme and outrageous conduct by the Defendants.  Since we hold that Defendants are entitled to judgment as a matter of law on Miller's statutory claims, we must necessarily hold that Miller failed to present substantial evidence in support of his emotional distress claim.  Accordingly, Defendants were entitled to summary judgment on that claim.

## DISPOSITION

The judgment is affirmed.  The parties are to bear their own costs on appeal.

CERTIFIED FOR PUBLICATION.


JOHNSON, J.


We concur:



ROTHSCHILD, P. J.



CHANEY, J.