Filed 4/3/25  Cadlerock Joint Venture v. Edith Enterprise CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| CADLEROCK JOINT VENTURE, L.P., <br><br> Plaintiff and Respondent, <br><br> v. <br><br> EDITH ENTERPRISE, LTD. et al., <br><br> Defendants and Appellants. | B335585 <br><br> (Los Angeles County Super. Ct. No. 22AHCV00268) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Margaret L. Oldendorf, Judge.  Affirmed.

Continental Law Firm and Grant Chien for Defendants and Appellants.

Sayyar Law and Assly Sayyar for Plaintiff and Respondent.

———————————————

Edith Enterprise, Ltd. (Edith) signed a revolving credit agreement with Citibank, N.A., and its principal, Helen Young, signed a personal guarantee. Plaintiff CadleRock Joint Venture, L.P. (Cadlerock), Citibank's assignee, successfully moved for summary judgment in this collection action against Edith and Young, and was awarded the unpaid balance of the loan along with accrued interest, costs and attorney fees. On appeal, Defendants contend that Plaintiff was not entitled to summary judgment, that the trial court lacked the power to enter judgment while its cross-complaint against Citibank remained unresolved, and that Plaintiff was not entitled to recover attorney fees because it was not yet a "prevailing party." We affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

**A. Citibank Extends Credit to Defendants**

Edith is an importer and reseller of automobile parts. In August 2011, Edith applied for a revolving line of credit from Citibank. The loan agreement required Edith to maintain a business checking account at Citibank, from which Citibank would deduct monthly principal and interest payments. Other provisions of Edith's loan agreement with Citibank provided that the loan would go into default if either Edith or Citibank closed Edith's Citibank checking account and that the agreement was governed by New York law.

Young signed the loan application as Edith's manager and as guarantor. Thereafter, Edith periodically drew down on its line of credit, and payments were automatically deducted each month from Edith's Citibank business checking account.

On April 20, 2020, Citibank's Fraud Prevention office sent a letter headed "Account Closing Notification," informing Young that, "[p]ursuant to a recent review," Citibank had determined it

2

"could no longer service" Edith's Citibank checking account, and that Citibank was "tak[ing] steps to terminate your banking relationship(s) with Citibank, pursuant to the terms of the Citibank Client Manual – Consumer Accounts." The letter went on to state that Edith's checking account would be closed in "approximately thirty to sixty business days." Nonetheless, as Young later testified in her declaration, "Citibank continued to allow Edith to use its Checking Account to repay the Credit Line and other monthly charges as before. Citibank did not close Edith's accounts and did not terminate Edith's banking relationship with Citibank with[in] the stated time period."

On November 25, 2020, Citibank sent a second letter, this time addressed to Edith and headed "New Account Intent to Close." The November 25 letter directs Edith to "the terms and conditions in your Citibank Client Manual" and states that the checking account would be closed in 10 business days, a decision Citibank made "as a result of a recent report from Early Warning Services (EWS)."[1] The letter further instructed Edith to "stop any additional transactions" on the Citibank business account, and to "cancel any . . . automatic payments or any other type of electronic transactions you may have set up for this account." In a follow-up letter dated December 29, 2020, Citibank confirmed that the account "has now been closed" and that it was "overdrawn" when closed. Edith made no further payments on its loan after October 25, 2020.

---

[1] EWS is a "consumer reporting agency" (*Freeman v. Early Warning Services, LLC* (E.D.Pa. 2020) 443 F.Supp.3d 581, 582) that provides "credit information and risk management services to financial institutions." (*Ali v. Early Warning Services, LLC* (E.D.Cal. 2017) 2017 U.S.Dist. Lexis 137266.)

3

On December 11, 2020, Young wrote to Citibank, referring to her checking account and asking "to know the reason you closed the account listed above and the balance was never refunded to me." Citibank never responded to this letter. Thereafter, Citibank continued to invoice Edith for regular monthly payments on the outstanding principal balance ($22,997.79) of the credit account. Each month's invoice grew in amount, based on nonpayment of the previous month's invoice, from a monthly payment due of $1,005.64 for the period ending October 15, 2020 until the final invoice in the record (for the period ending Aug. 15, 2021) listed a monthly payment due of $10,347.06.

**B. Plaintiff Acquires the Loan From Citibank**

In August 2021, Citibank sold Edith's loan to Plaintiff in exchange for undisclosed consideration. Plaintiff's Account Officer Michael Bowman sent Edith and Young identical letters dated October 8, 2021, informing them Plaintiff had purchased the loan from Citibank. These letters stated the balance owed was $22,997.79 in principal plus $1,291.90 in "accrued interest and other charges," for a total amount owed of $24,289.69. Each letter also included a "validation of debt notice" for Edith and Young to complete and return. In response to Bowman's letter, Young wrote on November 1, 2021, "For this line of credit for Edith Enterprise, Ltd, I have the linked Citibank checking account and autopay was set up monthly for over 10 years. It appeared on 11/1/2020 Citibank took the balance of $31,396.50 on this checking account and closed this checking account thereafter and left the credit line balance of $22,997.79 unpaid."

Young characterized her November 1 letter as "disputing the debt." Plaintiff, too, treated Young's November 1 letter as

"disput[ing] liability for the loan which CadleRock Joint Venture, LP received via assignment from Citibank on August 19, 2021." Bowman responded on November 16, 2021, by sending Edith a "payoff statement" demanding $25,206.68 as of November 5, 2021, with interest of $2.87 accruing daily. Accompanying this letter was an account showing amounts borrowed and payments made on Edith's loan between September 28, 2018, and October 25, 2020. Thereafter, on January 14, 2022, Bowman wrote identical letters to Young and to Edith, informing them that Edith's loan was now in default, and demanding "that you immediately pay all outstanding amounts of the debt in full" in the amount of $25,544.94. Young replied in a letter dated March 8, 2022, detailing the events leading to the closing of Edith's checking account, and advising Plaintiff "here are the transactions I would like to be answered in order for us to solve this debt."

### C. Plaintiff Sues Defendants and Moves for Summary Judgment

On May 9, 2022, Plaintiff filed this action against Edith and Young, asserting claims for relief for breach of contract, unjust enrichment and promissory estoppel. The latter two claims for relief were pleaded "in the alternative." On July 18, 2022, Edith and Young filed a general denial and affirmative defenses. More than six months later, on February 1, 2023, Defendants moved for leave to file a cross-complaint against Citibank, alleging causes of action for breach of contract, accounting, conversion, negligence, fraudulent transfer, violation of Business and Professions Code section 17200, and "common counts" for account stated and money had and received. The cross-complaint did not name Plaintiff as a party.

5

On April 3, 2023, Plaintiff moved for summary judgment against Defendants, or in the alternative for summary adjudication of each of its three claims for relief. In support of Plaintiff's motion, Bowman submitted a declaration describing the history of the loan from its inception to Plaintiff's declaring a default, and attaching as exhibits copies of Citibank's loan agreement, statements showing the history of Edith's borrowing and payment history, account statements from Edith's linked business checking account, Citibank's correspondence informing Defendants that the checking account was being closed, documentation showing Plaintiff's acquisition of the loan from Citibank, and correspondence between Plaintiff and Defendants.

On May 31, 2023, Defendants filed an ex parte application requesting an extension of time to respond to Plaintiff's motion, as well as a continuance of the pending trial date. Defendants informed the court that they needed an extension to "conduct discovery into Citibank involvement in the taking of funds from EDITH's business account that was used for the repayment of the loan at issue" and to "conduct discovery and depositions regarding whether Citibank removed funds from EDITH's business account and whether the funds were used to pay off the loan at issue." In a memorandum, Defendants described their theory of the case: "Defendants aver that Plaintiff, as the assignee of the loan, has no right to pursue the collection of the Loan because Citibank had removed the $31,396.60 ('Funds') from Defendant EDITH's checking account earmarked for the repayment of the Loan before the alleged breach." Over Plaintiff's opposition, the court continued the hearing on Plaintiff's motion for three months.

6

On September 1, 2023, Defendants filed their written opposition to Plaintiff's summary judgment motion. As they did in their ex parte application to continue the hearing, Defendants argued to the court that "[t]he overarching issue in this case is whether the $31,396.60 of EDITH's money taken by Citibank was used to repay the Loan and, if not, whether the taking was proper." Defendants went on to assert, however, that because they had not completed discovery from Citibank, "it is unreasonable to expect Defendants to decisively and persuasively rebut Cadlerock's contentions." Rather, Defendants argued that summary judgment should be denied because Plaintiff's evidence was insufficient: "Plaintiff has attached exhibits that are unauthenticated and testified to information about the contents of exhibits without personal knowledge or proper foundation. . . . Mr. Bowman appears to testify on various topics _not_ based on best of his knowledge. . . . Plainly, Mr. Bowman is just stating that he reviewed materials prepared by someone else with personal knowledge." Consistent with these arguments, Defendants filed objections to Plaintiff's evidence, arguing that Bowman lacked personal knowledge of the assertions in his declaration and that the written exhibits attached to his declaration were not authenticated, and that Plaintiff had not laid a foundation for admitting those exhibits.

**D. The Trial Court Grants Plaintiff's Motion**

On September 15, 2023, the trial court granted Plaintiff's motion for summary adjudication of its first claim for relief for breach of contract. The court began by addressing, and overruling, Defendants' objections to the exhibits attached to Bowman's declaration. Concluding that "Bowman is qualified to authenticate the records," the court noted that Bowman "avers he

7

is the person responsible for maintaining the loan file related to this debt, and that the exhibits he attaches are true and correct copies of records maintained by Cadlerock. Bowman avers that Exhibits 1-10 were provided to Cadlerock in hard copy at the time Cadlerock purchased this debt from Citibank, and that Exhibits 11-12, which are copies of what Citibank produced in this action pursuant to subpoena, match those records." Moving to the substance of the motion, the court concluded that Plaintiff "has met its burden of establishing each element of its breach of contract cause of action," namely "the existence of a contract," "Cadlerock's (or its predecessor in interest's) performance," "Defendant's breach," and "Cadlerock's damages."

Reviewing the opposition to Plaintiff's motion, the court noted the "evidence may support Defendants' claims against Citibank, but it does not demonstrate a triable issue as to the claims at issue here." Specifically, the court found that Defendants' "evidence does not demonstrate that there is a dispute about the loan itself, the default, or the amount owed." The court concluded that Plaintiff was entitled to summary adjudication of its first cause of action and that its other claims for relief "are pled in the alternative and are unneeded." The court ordered Plaintiff to lodge "an appropriate judgment."

**E. The Trial Court Awards Attorney Fees**

On October 2, 2023, prior to the entry of judgment, Plaintiff filed a motion to recover attorney fees as the prevailing party on its claim for breach of contract, citing Civil Code section 1717 and the attorney fee clause included among the "terms and conditions" of Defendants' loan agreement with Citibank.[2] The

---

[2] The attorney fee clause is headed "Collection Costs" and reads as follows: "You agree to pay on demand all costs and

8

motion was supported by a declaration of Plaintiff's counsel, describing the work done and the qualifications of counsel, and attaching a record of the hours worked on the case and amounts billed for each time entry. Opposing the motion, Defendants argued that an award of attorney fees was premature, both because the court only granted summary adjudication to Plaintiff, and because Defendants' cross-complaint against Citibank remained unresolved. Defendants even attempted to amend their cross-complaint to name Plaintiff as one of the fictitiously named cross-defendants.

On October 30, 2023, the trial court granted Plaintiff's motion and awarded attorney fees of $22,225. The court found that Plaintiff was the prevailing party on its claim for breach of contract, and was entitled to fees pursuant to Civil Code section 1717 and the fee clause in Edith's loan agreement with Citibank. The court rejected Defendants' argument that a fee award was premature, and denied as untimely their request to amend their cross-complaint to name Plaintiff. At the court's suggestion, at the hearing on its fee motion Plaintiff orally dismissed its second and third causes of action in the complaint, without prejudice. The next day, October 31, the court entered judgment in Plaintiff's favor and against Defendants, jointly and severally, in the amount of $50,607.94, consisting of the unpaid balance of the loan, prejudgment interest, costs and attorney fees. Defendants filed a timely notice of appeal.

---

expenses for collection of amounts due on your Account (by legal proceedings or otherwise) including without limitation attorneys' fees and court costs."

## DISCUSSION

### A. Standard of Review of Summary Judgment

Code of Civil Procedure section 437c, subdivision (c), states that "[a] motion for summary judgment shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In reviewing an order granting summary adjudication, "we apply the same de novo standard of review that applies to an appeal from an order granting summary judgment." (*Davis v. Kiewit Pacific Co.* (2013) 220 Cal.App.4th 358, 363.) "We review the evidence the parties submitted with their moving papers in the light most favorable to the nonmoving party. We then independently determine if the evidence establishes either that the plaintiff is entitled to judgment as a matter of law, or that there is a dispute on a material point that requires a trial to resolve." (*CSAA Ins. Exchange v. Hodroj* (2021) 72 Cal.App.5th 272, 276.)

### B. The Trial Court Properly Admitted Plaintiff's Evidence

Because we review "all the evidence set forth in the moving and opposition papers except evidence for which objections were made and sustained" (*Ryder v. Lightstorm Entertainment, Inc.* (2016) 246 Cal.App.4th 1064, 1072 (*Ryder*)), we first address Defendants' contention that the trial court improperly overruled their objections to Plaintiff's evidence. We review evidentiary rulings in the context of a summary judgment motion for abuse of discretion. (*LAOSD Asbestos Cases* (2023) 87 Cal.App.5th 939, 946 & fn. 3; *Ryder,* at p. 1072.)

Defendants objected to each paragraph of Bowman's declaration on the grounds of lack of foundation, lack of personal

10

knowledge, speculation and "best evidence rule." Likewise, Defendants objected to each exhibit to Bowman's declaration on grounds of lack of foundation, failure to authenticate and hearsay. On appeal, Defendants argue that Plaintiff's exhibits were not properly authenticated and were hearsay. We address each of these contentions in turn.

**1. Plaintiff's exhibits were properly authenticated.**

The trial court did not abuse its discretion when it overruled Defendants' objections that exhibits were not authentic. "[A] document is authenticated when sufficient evidence has been produced to sustain a finding that the document is what it purports to be [citation]. As long as the evidence would support a finding of authenticity, the writing is admissible." (*Jazayeri v. Mao* (2009) 174 Cal.App.4th 301, 320.) The record contains substantial evidence that Plaintiff's exhibits are what they purport to be. Bowman is obviously competent to authenticate the documents showing Plaintiff's purchase of Edith's loan from Citibank, and to authenticate letters he wrote to Defendants and their responses to those letters. (Evid. Code, §§ 1413, 1420.) Moreover, Bowman was not the only witness who authenticated exhibits. Plaintiff's trial counsel submitted a declaration confirming that pleadings and discovery responses offered as exhibits were documents produced or served in the course of the litigation. Citibank's loan agreement with Edith including Young's personal guarantee, and the records of transactions under the loan agreement, were produced in response to a subpoena to Citibank. Citibank's document production included a declaration of Citibank's custodian of records, stating under penalty of perjury that the records produced were true copies of original records maintained

11

by Citibank in the ordinary course of its business.  (See *Jazayeri,* at pp. 320-321 [documents produced in response to a subpoena or FOIA request are considered authentic under Evid. Code, § 1420].)  In short, the declarations by Bowman, by Plaintiff's counsel and by Citibank's custodian of records furnished substantial evidence that Plaintiff's exhibits were what they purport to be, thereby satisfying the requirement that records be authentic.

### 2. The trial court properly overruled Defendants' hearsay objections.

We also agree with the trial court that Plaintiff's exhibits were not made inadmissible by the hearsay rule.  Several exhibits, notably the loan agreement with Citibank and Plaintiff's acquisition of Edith's loan, are nonhearsay.  (*J & A Mash & Barrel, LLC v. Superior Court* (2022) 74 Cal.App.5th 1, 19 [written lease extension agreement and sales agreement had independent legal significance and were not hearsay]; *Bank of America Nat'l Trust & Sav. Asso. v. Taliaferro* (1956) 144 Cal.App.2d 578, 581-582 [conditional sales contract and assignment of contract are "acts in themselves constituting legal results in issue in the case" and thus not hearsay].)  Defendants' written discovery responses are statements by an opposing party within the meaning of Evidence Code section 1220.  (*Leasman v. Beech Aircraft Corp.* (1975) 48 Cal.App.3d 376, 380.)

The trial court correctly admitted Citibank's records of its transactions with Edith under the hearsay exception for business records.  "A trial judge has broad discretion in admitting business records under Evidence Code section 1271, and it has been held that the foundation requirements may be inferred from the circumstances.  Indeed, it is presumed in the preparation of the

12

records not only that the regular course of business is followed but that the books and papers of the business truly reflect the facts set forth in the records brought to court." (*People v. Dorsey* (1974) 43 Cal.App.3d 953, 961.)  Here, the trial court was not limited to relying on a presumption the account records were true copies of original records prepared in the ordinary course of business, because Citibank's custodian of records confirmed as much.  (*J & A Mash & Barrel, LLC, supra*, 74 Cal.App.5th at p. 21 [records accompanied by a declaration of the custodian of records are "business records . . . subject to an exception to the hearsay rule.  (Evid. Code, § 1271.)"].)

## C. The Trial Court Properly Granted Plaintiff's Motion

Having concluded that Plaintiff's evidence was admissible, we turn next to Defendants' contention that it raised triable issues of fact preventing summary adjudication of Plaintiff's first claim for relief for breach of contract.  We find no error.

### 1. Plaintiff's burden on a motion for summary adjudication.

"[T]he party moving for summary judgment bears an initial burden of production to make a prima facie showing of the nonexistence of any triable issue of material fact; if he carries his burden of production, he causes a shift, and the opposing party is then subjected to a burden of production of his own to make a prima facie showing of the existence of a triable issue of material fact." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 (*Aguilar*).)  "A plaintiff moving for summary adjudication meets its burden if it proves each element of the cause of action." (*Quidel Corp. v. Superior Court* (2020) 57 Cal.App.5th 155, 163.)  However, "summary judgment law in this state no longer

13

requires a plaintiff moving for summary judgment to disprove any defense asserted by the defendant as well as prove each element of his own cause of action. . . .  All that the plaintiff need do is to 'prove[]each element of the cause of action.'  [Citation.]" (*Aguilar,* at p. 853.)  "Once the plaintiff . . . has met that burden, the burden shifts to the defendant or cross-defendant to show that a triable issue of one or more material facts exists as to the cause of action or a defense thereto."  (Code Civ. Proc., § 437c, subd. (p)(1).)

**2. Plaintiff's prima facie case that Edith breached its credit agreement.**

We agree with the trial court that Plaintiff presented a prima facie case that Edith breached its loan agreement.[3]  Under New York law, "the essential elements of a cause of action to recover damages for breach of contract [are] the existence of a contract, the plaintiff's performance under the contract, the defendant's breach of that contract, and resulting damages." (*JP Morgan Chase v. J.H. Elec. of New York, Inc.* (N.Y. 2010) 69 A.D.3d 802, 803 [893 N.Y.S.2d 237, 239].)  Plaintiff submitted evidence to support each of these elements.  First, it introduced evidence of the contract at issue, consisting of Citibank's loan agreement with Edith and the accompanying personal guarantee by Young.  Second, it introduced evidence of the performance of the agreement by its predecessor, Citibank, in the form of loan statements showing Citibank extended credit to Edith during the period 2011-2020.  Third, it introduced evidence of Edith's breach of the agreement (and Young's corresponding breach of her

---

[3]     "A prima facie showing is one that is sufficient to support the position of the party in question."  (*Aguilar, supra*, 25 Cal.4th at p. 851.)

personal guarantee) by failing to make payments on the outstanding debt after October 2020, and by failing to make any payments following its acquisition of the loan. Fourth, and finally, Plaintiff introduced evidence of damages, in the form of unpaid principal and interest following the breach. Three of these elements are admitted by Defendants: in her declaration opposing Plaintiff's motion, Young admits that Edith entered into the loan agreement with Citibank, that Citibank extended credit to Edith through October 2020, and that the outstanding balance on the loan was $22,997.79.

### 3. Defendants failed to make a prima facie showing of a triable dispute of fact.

After Plaintiff presented a prima facie case of breach, the burden shifted to Defendants to make a prima facie showing that one or more issues of fact prevent summary adjudication. "[W]e must decide whether the defendant has conclusively negated a necessary element of the plaintiff's claim or has established an affirmative defense." (*Ryder, supra,* 246 Cal.App.4th at p. 1072.) To satisfy this burden requires "the presentation of 'evidence.' [Citation.]" (*Aguilar, supra*, 25 Cal.4th at p. 850.) "Mere conclusions of law or fact are insufficient to satisfy the evidentiary requirements for a summary judgment statute." (*Perkins v. Howard* (1991) 232 Cal.App.3d 708, 713.)

Apart from their evidentiary objections, Defendants contended that Citibank wrongly closed Edith's business checking account and withheld the proceeds, and that Citibank's wrongdoing is attributable to Plaintiff as Citibank's assignee. In order to prevail on this theory, Defendants had to make a prima facie case that Citibank breached the checking account agreement. We conclude that Defendants failed to meet that

15

burden.  Thus, we need not address whether a breach of the checking account agreement by Citibank could be imputed to Plaintiff, nor whether an imputed breach would defeat summary adjudication.

The relationship between a bank and the holder of a checking account "is that of debtor and creditor, being founded upon contract."  (*Danning v. Bank of America* (1984) 151 Cal.App.3d 961, 969, disapproved on another ground in *In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1137.)  The record confirms that such an agreement exists– Citibank's letters dated April 20, 2020 and November 25, 2020, both refer to a "Citibank Client Manual" setting out the "terms and conditions" governing Edith's checking account, pursuant to which Citibank claims "the right to close your account(s) at any time."  Defendants offered both these letters in evidence.  The problem, however, is that they have offered no evidence showing the terms of the checking account agreement governing Citibank's conduct.

"Unless statutory language or public policy dictates otherwise, the terms of a written agreement define the rights and obligations of the parties to the agreement."  (*Abiele Contracting, Inc. v. New York City Sch. Constr. Auth.* (1997) 91 N.Y.2d 1, 9 [666 N.Y.S.2d 970, 689 N.E.2d 864].)  In the absence of evidence of the terms of the agreement setting out Citibank's and Edith's respective rights and duties, Defendants have not met their burden to show Citibank breached an agreement by closing Edith's checking account, or by withholding the proceeds of that account from Edith.  Defendants' mere assertion that Citibank acted wrongly, unsupported by reference to any written agreement, is no substitute for evidence.  "A triable issue of material fact may not be created by speculation or a 'stream of

16

conjecture and surmise.' [Citations.] Instead, the [opposing party] must produce 'substantial responsive evidence.' [Citation.]" (*Miller v. Fortune Commercial Corp.* (2017) 15 Cal.App.5th 214, 220-221.) "Evidence that leads only to speculation or conjecture does not create a triable issue of fact." (*Pipitone v. Williams* (2016) 244 Cal.App.4th 1437, 1458.)[4]

Defendants also argue that by closing Edith's checking account, Citibank eliminated the "exclusive" means by which Edith was to repay the amount it borrowed. Defendants point to no language in their loan agreement that supports their contention the business checking account was the only source from which they could be required to pay back the loan. To the contrary, the agreement expressly states that "[y]ou agree to repay us all amounts owed under the Agreement plus interest and any other charges, as provided for in the Agreement." The loan agreement also provides that the loan would be in default if either Edith or Citibank closed the checking account, upon which event Citibank has the option to declare the entire unpaid balance "immediately due and payable." Under Defendants' construction of the loan agreement, Edith could create a default

---

[4] Defendants' conclusory accusations are also belied by their own exhibits. For example, Young's assertion that "without any notice or explanation, Citibank zeroed out the entire balance of Edith's Checking Account," is contradicted by Citibank's letters dated April 20, November 25, and December 29, 2020, all of which addressed Citibank's intent to close, and closure of, Edith's checking account. In addition, Citibank's November 2020 checking account statement discloses that the balance of the checking account was withdrawn on November 2, 2020, and its December 29, 2020 letter states that the account was overdrawn when closed.

17

by closing its Citibank checking account and thereafter cite that default as an excuse to avoid further liability. We decline to construe the loan agreement in a manner that would lead to such an absurd result.

Finally, Defendants argue that by closing Edith's checking account and withholding the proceeds, Citibank impeded Defendants' performance of the loan agreement in violation of an implied covenant of good faith and fair dealing in its checking account agreement. Even assuming that Citibank's conduct is imputable to Plaintiff, this argument, too, lacks merit. In New York, as in California, the implied covenant cannot create obligations inconsistent with the terms of the parties' written agreement. Thus, "no obligation can be implied that 'would be inconsistent with other terms of the contractual relationship.' [Citation.]" (*Dalton v. Educational Testing Service* (1995) 87 N.Y.2d 384, 389 [663 N.E.2d 289, 292].) " '[W]here a contract allows one party to [exercise a contractual right] in "its sole discretion" and for "any reason whatsoever" the covenant of good faith and fair dealing cannot serve to negate that provision.' " (*111 W. 57th Inv. LLC v. 111 W57 Mezz Inv. LLC* (N.Y. 2023) 220 A.D.3d 435, 436 [198 N.Y.S.3d 521, 523].)

### 4. Plaintiff made a prima facie showing that Young breached her guarantee.

Plaintiff was also entitled to summary adjudication that Young breached her personal guarantee. In order to show liability on a personal guarantee, Plaintiff is required to prove "that there has been a default on the payment of a promissory note and the party against whom judgment has been sought has executed a valid guaranty warranting the payment of the amount due under that note." (*Overseas Private Inv. Corp. v. Kim* (N.Y.

18

2010) 69 A.D.3d 1185, 1187 [895 N.Y.S.2d 217, 219].) Young's personal guarantee reads as follows: "Each guarantor individually and personally, jointly and severally, absolutely and unconditionally guarantees to Citibank and its successors, endorsees, and assignees the prompt payment of each and every obligation and liability of every nature and description of the Applicant identified in the Account Agreement, whether now existing or arising in the future, including, but not limited to all loans, interest, late charges, fees, and attorney fees ('Obligations')."

The personal guarantee was a conspicuous part of Citibank's credit application. For example, in addition to information about Edith's business, the application required each guarantor to provide personal financial information including a statement of assets and liabilities. The guarantee itself is a separate paragraph of the application, specifically captioned "PERSONAL GUARANTEE." Young signed the application, not only as Edith's owner and as manager, but separately as a guarantor of Edith's obligations under the agreement. Above Young's signature as guarantor appear the words, "By signing below, each Guarantor jointly and severally agrees to the terms of the Personal Guarantee and the obligations referenced therein, and represents that the information which such Guarantor has provided in connection with the preparation of this Application and with respect to the documents related thereto are correct in all material respects."

Young's only argument in opposition to Plaintiff's motion is that the personal guarantee is unenforceable because the Citibank representative explained it to her in Mandarin. We agree with the trial court that Young did not raise a triable issue

19

with respect to the guarantee. Even if the guarantee was explained to Young in Mandarin, nowhere does Young aver that she does not understand that language. More important, the guarantee itself—like the rest of the credit application—is in English. The record affirmatively demonstrates that Young was sufficiently fluent in English to correspond with Citibank and with Bowman on numerous occasions. Moreover, two weeks elapsed between the date Edith applied for credit and the date of Citibank's letter approving Edith's application, during which time Young could have reviewed her personal guarantee, asked questions of Citibank or sought advice from a third party.

"The duty to read doctrine is contract law's analog to the assumption of risk doctrine in tort law. A buyer who could have read but did not assumes the risk of being bound by any unfavorable terms." (Ayres & Schwartz, *The No-Reading Problem in Consumer Contract Law* (2014) 66 Stan.L.Rev. 545, 549.) New York law provides that "[i]n the absence of fraud, duress or some other wrongful act by a party to a contract, the signer of an agreement is deemed to be conclusively bound by its terms whether or not he or she read it." (*Maines Paper & Food Service, Inc. v. Adel* (N.Y. 1998) 256 A.D.2d 760, 761 [681 N.Y.S.2d 390, 391].) The defendant in *Maines,* like Young, unsuccessfully opposed a motion for summary judgment by arguing that his "difficulty with the English language" meant he did not realize he was signing a personal guarantee. Rejecting this claim, the appellate court observed that "[t]he agreement unambiguously and clearly indicates that it contained a 'PERSONAL GUARANTEE' and defendant signed his name on a signature line for the 'GUARANTOR.' Having failed to read the agreement or, because of an alleged difficulty with the English

20

language, having failed to have someone else read or explain it to him, defendant is precluded from asserting fraudulent inducement since there cannot be any justifiable reliance [citations]." (*Id.,* 681 N.Y.S.2d at p. 391.)

Like the defendant in *Maines*, nothing in Young's declaration raises any circumstance that would excuse her from being held liable on her personal guarantee. The loan application conspicuously provided, in English, that Young was guaranteeing Edith's obligations. Young has not raised a triable dispute of fact as to Plaintiff's right to enforce this guarantee.

## D. The Trial Court Had The Power To Enter a Separate Judgment

Defendants next contend that the trial court lacked jurisdiction to enter judgment, and that judgment was entered without notice. The record belies these contentions. Plaintiff's notice of motion is captioned a "Motion for Summary Judgment or, in the Alternative, Motion for Adjudication," and in the notice itself Plaintiff asks "for an order granting summary judgment in Plaintiff's favor and against Defendants." Defendants cannot argue they lacked notice that Plaintiff's motion, if granted, could result in entry of an adverse judgment.

Defendants also argue the trial court erred by entering judgment because it only granted a motion for summary adjudication of Plaintiff's first claim for relief for breach of contract. This argument ignores the fact that, at the trial court's suggestion, Plaintiff orally dismissed its second and third causes of action prior to entry of judgment. Defendants do not deny these claims were dismissed. Instead, they object that Plaintiff did not request the dismissal in writing on form CIV-110. They cite no authority for the proposition that a claim for relief may

21

not be orally dismissed at a hearing.  Moreover, Defendants'
argument finds no support in Code of Civil Procedure section 581,
subdivision (c), which states that a plaintiff "may dismiss his or
her complaint, or any cause of action asserted in it . . . with or
without prejudice prior to the actual commencement of trial."
Subdivision (m) of section 581 further provides that its provisions
"shall not be deemed an exclusive enumeration of the court's
powers" to dismiss an action.[5]

Defendants also argue the trial court erred by entering a
separate judgment on Plaintiff's complaint while Defendants'
cross-complaint against Citibank remains unresolved.  Again,
there was no error.  Plaintiff is not a party to Defendants' cross-
complaint.  The only claims between Plaintiff and Defendants are
those alleged in Plaintiff's complaint.  Plaintiff was granted
summary adjudication of its claim for breach of contract, and it
dismissed its remaining claims for relief.  Thus, there are no
issues remaining to be litigated between Plaintiff and
Defendants, and Plaintiff was entitled to judgment regardless of
Defendants' pending cross-complaint against Citibank.  (See
*Sjoberg v. Hastorf* (1948) 33 Cal.2d 116, 118 [a separate judgment
that is "final as to some of the parties" may be entered while a
cross-complaint is pending].)

---

[5]     Because we find that Plaintiff dismissed its second and
third claims for relief prior to entry of judgment, we need not
address Plaintiff's alternative argument that summary
adjudication of the first claim for relief alone "effectively disposed
of the case" and entitled Plaintiff to judgment, citing *California
Assn. of Psychology Providers v. Rank* (1990) 51 Cal.3d 1, 9, and
*Belio v. Panorama Optics, Inc.* (1995) 33 Cal.App.4th 1096, 1102.

### E. The Trial Court Had The Power to Award Attorney Fees to Plaintiff

Defendants' final contention is that the trial court lacked the power to award attorney fees. They argue that, because the court had not yet entered judgment, Plaintiff was not a "prevailing party" for purposes of a fee award, and that it was premature to award fees while Defendants' cross-complaint against Citibank remains unresolved. Neither argument has merit. As noted above, the trial court could properly enter a separate judgment on the complaint while Defendants' cross-complaint against Citibank is pending. Given that the court could enter judgment, it necessarily follows that judgment could include an award of costs and, where appropriate, an award of attorney fees.

Defendants' argument that Plaintiff was not a "prevailing party" entitled to attorney fees until *after* entry of judgment is also inconsistent with Civil Code section 1717, subdivision (b)(1), which provides that the trial court "shall determine who is the party prevailing on the contract for purposes of this section, *whether or not the suit proceeds to final judgment*." (Italics added.) This is consistent with the general rule that courts may "award[] attorney fees to a party obtaining an appealable order or judgment in a discrete legal proceeding even though the underlying litigation on the merits was not final." (*Otay River Constructors v. San Diego Expressway* (2008) 158 Cal.App.4th 796, 807.) Here, Plaintiff's complaint is a "discrete legal proceeding" on which the trial court could properly enter a separate judgment that included an award of attorney fees.

## DISPOSITION

The judgment entered on October 31, 2023, is affirmed. Plaintiff is awarded its costs on appeal.

RICHARDSON, J.

We concur:

LUI, P. J.

ASHMANN-GERST, J.