Filed 12/19/25  H.N. v. Scotts Valley Unified School District CA6

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SIXTH APPELLATE DISTRICT

| | |
|---|---|
| H.N., a minor, by JUSTIN NORDGREEN, his Guardian,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>SCOTTS VALLEY UNIFIED SCHOOL DISTRICT, et al.,<br><br>Defendants and Respondents. | H052568<br>(Santa Cruz County<br>Super. Ct. No. 22CV01828) |

During the COVID-19 pandemic, H.N. was in the first and second grades at Brook Knoll Elementary School.  Following state-wide guidance, the school adopted measures such as masking and testing to control spread of the disease, which H.N. and his parents opposed.  As a result of this opposition, and the insistence of H.N.'s parents that he attend school without complying with several measures, H.N. was kept in isolation for approximately three school weeks.  In addition, on one occasion when H.N. brought a sign protesting the school's COVID-19 measures, H.N. was sent to the principal's office, and his sign was temporarily confiscated.

In 2022, H.N. sued the Scotts Valley Unified School District (District), the superintendent of the District, the principal of his school, and his teacher (collectively, Defendants).  H.N. claimed that Defendants violated his constitutional rights and

committed several torts. After discovery, Defendants moved for summary judgment. The court concluded that governmental immunities barred the claims against the District, the superintendent, and the principal. It also concluded that H.N. had failed to raise a triable issue concerning any of his claims. Accordingly, the trial court granted Defendants' motion and entered judgment in their favor.

H.N. appeals, contending that none of the Defendants are immune and that he raised triable issues on all his claims. He also contends that the trial court abused its discretion in excluding evidence and refusing to take judicial notice of documents.

As explained below, we conclude that summary judgment was properly entered. In particular, we conclude that the trial court did not abuse its discretion in excluding evidence and denying judicial notice. We also conclude that the District, the superintendent, and the principal are immune under Government Code section 855.4 because the actions challenged by H.N. were taken in carrying out public health policies controlling the spread of disease and H.N. failed to raise a triable issue concerning whether they acted without due care. (Subsequent undesignated statutory references are to the Government Code.) In part for this reason and in part because schools have authority to control the location of students during school hours, we conclude as well that H.N. failed to raise a triable issue with respect to any of his claims.

The judgment is therefore affirmed.

## I. BACKGROUND

### A. State COVID-19 Guidance

In March 2020, in response to the COVID-19 pandemic, Governor Newsom declared a state of emergency. In a series of executive orders related to the pandemic, the Governor confirmed the authority of the California Public Health Officer "to take any action she deems necessary to protect public health in the face of the threat posed by COVID-19" and exercised his authority under the Emergency Services Act (§ 8550 et seq.) to suspend application of the Administrative Procedure Act (APA) (§ 11340 et seq.)

2

to the Public Health Officer's COVID-19 directives. (Governor's Exec. Order No. N-60-20 (May 4, 2020) p. 3, ¶ 2 [citing § 8571]; *id*. pp. 2-3, ¶ 2 [authorizing actions by the Public Health Officer].) Subsequently, the Governor expressly recognized the authority of local health officers "to establish and implement public health measures . . . that are more restrictive than, or that otherwise exist in addition to, the public health measures imposed on a statewide basis . . . ." (Governor's Exec. Order No. N-07-21 (June 11, 2021) p. 2, ¶ 4.)

In August 2021, the California Department of Public Health (CDPH) issued guidance requiring K-12 students who attended school in-person to wear masks indoors and directing schools to "develop and implement local protocols to enforce mask requirements" and to "offer alternative educational opportunities for students who are excluded from campus because they will not wear a face covering." Following this guidance, District schools reopened for full-time, in-person instruction, and the District informed students and their families that students would be required either to wear masks indoors while attending school in-person or to enroll in full-time, independent study.

In early January 2022, in light of the appearance of a COVID-19 variant with increased transmissibility, CDPH issued updated guidance for schools. This guidance recommended that "[i]n the event of wide-scale and/or repeated exposures" to COVID-19, schools should consider implementing weekly COVID-19 testing until exposures decreased.

In March 2022, after the COVID-19 threat had eased, CDPH issued new guidance which strongly recommended indoor masking in schools but allowed schools to choose to stop enforcing masking requirements.

## B. The Conduct at Issue

In early January 2022, the District's superintendent Tanya Krause notified parents that the District planned to follow CDPH guidance regarding testing in the event of a surge in COVD-19 cases. In January 2022, Brook Knoll Elementary School experienced

3

such a surge, with exposure rates exceeding 50 percent among its student population.  In response, Brook Knoll's principal Joshua Wahl notified families that, effective Thursday, January 20, 2022 and through February 11, 2022, the school would be implementing a school-wide "modified quarantine."  Under this modified quarantine, all students attending school in-person were considered to have been exposed, unvaccinated students were required to test weekly for COVID-19, and fully vaccinated students were encouraged to test weekly.  Unvaccinated students not testing weekly were required to quarantine at home and participate in an independent study instructional program.

### 1. *The Initial Isolation Period*

H.N.'s father strongly opposed the school's modified quarantine and its testing requirements, which required H.N., as an unvaccinated student, to take weekly COVD-19 tests.  The father contacted both Principal Wahl and Superintendent Krause, asserting that the District's protocols were illegal and that he would continue bringing H.N. to school every day without him testing for COVID-19.  H.N.'s father also threatened to record District staff and to send the recordings to the media if any District staff tried to send H.N. home for failing to comply with masking and testing mandates.

H.N.'s father also contacted the Scotts Valley Police Department and demanded that Superintendent Krause and other District administrators be arrested for enforcing masking and testing mandates.  Superintendent Krause in turn notified the Scotts Valley police chief of threats that H.N.'s father had made toward herself, Principal Wahl, and Brook Knoll Elementary School.

After the modified quarantine protocol went into effect, H.N. continued attending school although he remained unvaccinated and declined to engage in testing.  H.N.'s teacher, Meaghann Gelter, notified Principal Wahl that H.N. was in class.  Over the next week, Wahl communicated with H.N.'s father several times regarding the modified quarantine protocols.  On January 26, 2022, Wahl offered a compromise:  Rather than indefinitely enrolling in independent study, H.N. could participate in a "temporary

4

[q]uarantine" at home for 10 days, after which he could return to school. However, in a subsequent e-mail Wahl reiterated that H.N. would not be permitted in the classroom unless he participated in COVID testing.

H.N.'s father did not respond to Principal Wahl and on Friday, January 28, 2022, dropped H.N. off at school. Because H.N. had not performed the weekly testing required for unvaccinated students, he was removed from his classroom and sent either to the nurse's office or Principal Wahl's office until his parents picked him up. That day, H.N.'s father went to the District office, demanded to speak to Superintendent Krause, and for 15-20 minutes expressed his belief that the District's COVID-19 policies and procedures were unsupported by science.

On Monday through Wednesday of the following week (January 31 through February 2, 2022), H.N.'s parents continued to drop him off at school, refused weekly COVID testing, and refused requests to pick H.N. up before the end of the school day. Because the District's protocols prohibited untested unvaccinated students from being on campus, Superintendent Krause authorized Principal Wahl to hire a substitute teacher to supervise H.N. one-on-one during the school day. For the next three days, H.N. was removed from his regular classroom and taught by a substitute teacher in a vacant classroom which was being used to store furniture and cleaning supplies. Gelter, his teacher, provided work packets for him to complete, though H.N. said that he only drew on the packets. H.N. also spent lunchtime and recess alone with the substitute.

On January 31, 2022, H.N. was not allowed to attend an afterschool program. As a result, he was left alone at the school pickup area until a neighbor, who was in the elementary school pickup line, saw H.N., contacted his mother, and at the mother's request took him home. The record does not reflect who prevented H.N. from attending the afterschool program, as Principal Wahl denied any knowledge of a staff member doing so and asserted that the program is not affiliated with the District. H.N. also was prevented from attending the afterschool program on February 1 and 2, 2022.

5

The modified quarantine ended on February 3, 2022, a week earlier than initially expected, and unvaccinated students such as H.N. were no longer required to undergo weekly COVID testing.

### 2. The "End This Nonsense" Sign

On February 15, 2022, nearly two weeks after the modified quarantine ended, H.N. arrived late to school and his parents escorted him to his classroom. According to his teacher Gelter, when the class was lined up outside, H.N.'s father handed him a large sign, which H.N. held up and said "end this nonsense, end this nonsense." Gelter allowed H.N. to continue to hold up the sign for the several remaining minutes of unstructured time, until the whistle blew for class to begin, at which point she sent H.N. to the office. According to Principal Wahl, H.N. was sent to his office for disrupting class, and he (the principal) sent an e-mail informing H.N.'s father that students were not permitted to interrupt instructional time and reminding the father that H.N. was not wearing a mask indoors as required. Wahl kept H.N.'s sign in his office for pickup after school and returned H.N. to class.

H.N.'s description of the events is generally consistent with that of Gelter and Wahl. According to H.N., he brought a sign to school that said "End this Nonsense" and held it up outside of his classroom. H.N. also states that Gelter grabbed the sign out of H.N.'s hand and sent him to the office, but does not deny that he was allowed to hold the sign up for several minutes. However, H.N. denies that he was being disruptive or that he protested during instructional time.

Following this incident, Gelter e-mailed Principal Wahl to express concerns about the presence of H.N.'s parents on campus and the safety of her class given their disregard for school rules.

### 3. The Second Isolation Period

After the sign incident, H.N. continued to refuse to mask indoors, and on February 22, 2022, Principal Wahl took H.N. out of class and called his father to pick

6

H.N. up from school, which the father refused to do. Wahl also repeatedly e-mailed H.N.'s father regarding H.N.'s refusal to mask. Nevertheless, for the next 12 school days, H.N.'s father continued to bring H.N. to school, H.N. continued to refuse to wear a mask, and his father continued to refuse to pick him up.

During this time period, H.N. was again isolated either in the unused kindergarten classroom with a substitute teacher or, when a substitute was not available, in Principal Wahl's office. H.N.'s teacher Gelter again prepared work packets for him to complete, but H.N. asserts that he was merely given the packets, rather than taught from them. Additionally, a substitute teacher made H.N. run laps alone outside during his recess time.

In late February 2022 Superintendent Krause, Principal Wahl, and the District's legal counsel discussed whether the conduct of H.N.'s father in repeatedly dropping H.N. off at school, knowing he would not be allowed in the classroom, warranted a call to child protective services. However, the District ultimately decided against doing so.

On March 12, 2022, in light of new state guidance, the District dropped the masking requirement in favor of a masking recommendation. H.N. does not allege he was removed from the classroom for not masking after this.

### 4. Subsequent Events

In September 2022, H.N. was sent home from school and told to quarantine for 10 days due to vomiting. H.N. contends that he was "forced to sit in the lobby every school day for a week and a half because [he] did not take two COVID tests."

Also in or around September 2022, the District made "multiple requests of [H.N.'s father] to comply with" requirements about checking in at the school office and the reinstated requirement that students wear masks in the classroom. Due to the father's refusal to comply with these requirements, on September 12, 2022, Superintendent Krause, the District's Director of Student Services Nadia Oskolkoff, and Principal Wahl decided to contact the police for assistance.

7

Six months later, in March 2023, Scotts Valley police officers pulled over H.N.'s father in his driveway, and one officer drew a weapon. The father believes that this "treatment was as a result of the communications between . . . Krause and Chief Walpole in their efforts to weaponize agents of the state against [him] under the color of law."

## C. Proceedings Below

In March and April 2022, H.N. submitted tort claims to the District, each of which was denied. The following August, H.N. sued Defendants—the District, Superintendent Krause, Principal Wahl, and H.N.'s teacher Gelter. After the trial court granted a demurrer with leave to amend, H.N. amended his complaint, adding Director of Student Services Oskolkoff as a defendant. In the amended complaint, H.N. asserted three tort claims: false imprisonment (though only against the District, Krause, Wahl, and Gelter), negligence, and intentional infliction of emotional distress. H.N. also asserted a violation of the Tom Bane Civil Rights Act (Bane Act) (Civil Code, § 52.1), as well as violations of the First and Fourteenth Amendments to the United States Constitution; Article I, section 2(a) of the California Constitution; and Education Code section 48907.

After conducting discovery, Defendants (but not Oskolkoff) moved for summary judgment. The District, Superintendent Krause, and Principal Wahl asserted immunity under sections 820.2, 855.4, 818.2, and 820.4. In addition, Gelter as well as the rest of the Defendants argued that H.N. failed to establish a substantive element of each claim. In opposition, H.N. submitted his own declaration as well as declarations from his parents, a neighbor, his therapist, and an expert on immuno-pharmacology.

On July 8, 2024, the trial court granted summary judgment to the District, Krause, Wahl, and Gelter.[*] It ruled that the District, Krause, and Wahl were entitled to judgment

---

[*] The trial court did not grant summary judgment to Oskolkoff, who apparently had not yet been served with the amended complaint, because Oskolkoff was not included in the answer to the amended complaint or mentioned in the summary judgment motion.

as a matter of law on all of H.N.'s claims based on governmental immunity. The trial court also found that H.N. had failed to raise a triable issue on any of his claims. Finally, the trial sustained objections to the declarations from H.N.'s expert and his therapist, to seven paragraphs in the declarations of H.N.'s parents and his neighbor, and to three of H.N.'s requests for judicial notice.

In ruling that governmental immunity bars the claims against the District, Krause, and Wahl, the trial court concluded that Krause and Wahl made discretionary decisions concerning masking, testing, and quarantining, and also concerning implementation and application of those policies, that are absolutely immune from liability under section 820.2 and that this immunity protects the District as well under section 815.2. The trial court also found immunity under section 855.4, which provides immunity to public entities and public employees for acts or omissions related to preventing or controlling the spread of disease.

In ruling that H.N. failed to raise a triable issue concerning any of his claims, the trial court concluded that H.N. could not show confinement without lawful privilege—an essential element of false imprisonment—because schools are required to supervise students and enforce rules and regulations protecting their health while in the school's care. The court also ruled that H.N. failed to present any evidence of a breach of duty of care to support his negligence claim, and that H.N. failed to present evidence of "extreme and outrageous conduct" necessary for his intentional infliction of emotional distress claim. Regarding the Bane Act claim, the trial court ruled that H.N. failed to raise a triable issue concerning whether Defendants sought to interfere with the exercise of his constitutional rights by committing or threatening violence.

Finally, the trial court ruled that H.N.'s claim for constitutional violations and violation of Education Code section 48907 failed because H.N. made no attempt to show any such violations in his opposition brief. Instead, the court observed, H.N. "appears to abandon this claim" and instead argue that CDPH guidelines are not binding because they

9

were not adopted pursuant to the APA.  Noting that the Governor has authority under section 8571 to suspend regulatory statutes such as the APA, the court ruled that this argument failed.

The trial court entered judgment in favor of the District, Krause, Wahl, and Gelter on July 25, 2024, and notice of entry of judgment was served on July 29, 2024.  H.N. timely appealed.

## II. DISCUSSION

H.N. argues that the trial court erred in ruling that governmental immunity bars the claims against the District, Superintendent Krause, and Principal Wahl and that he failed to raise any triable issue concerning his claims against Gelter and the other Defendants.  H.N. also argues that the trial court abused its discretion in excluding evidence he submitted and denying his requests for judicial notice.  Below, we address each of these arguments, beginning with the rulings on exclusion and judicial notice.  However, before doing so, we briefly review the standards governing summary judgment.

### A. Summary Judgment

Summary judgment is appropriate when "there is no triable issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).)  A party moving for summary judgment bears the initial burden of demonstrating both that there is no triable issue of material fact and that it is entitled to judgment as a matter of law.  (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 (*Aguilar*).)  To satisfy this burden, a defendant moving for summary judgment must demonstrate that the plaintiff's causes of action lack merit either because the plaintiff cannot prove at least one element of the claims or because there is a complete defense to the claims.  (Code Civ. Proc., § 437c, subd. (p)(2); *Aguilar*, at p. 850.)  If the defendant makes this initial showing, the burden shifts to the plaintiff to present evidence demonstrating a triable issue of material fact.  (Code Civ. Proc., § 437c, subd. (p)(2); *Aguilar*, at p. 850.)

10

On appeal, we review summary judgment orders de novo, applying the rules and standards governing a trial court's evaluation of summary judgment motions. (See e.g., *Hobbs v. City of Pacific Grove* (2022) 85 Cal.App.5th 311, 321.) Accordingly, we "liberally constru[e] the evidence in support of the party opposing summary judgment and resolv[e] doubts concerning the evidence in favor of that party." (*Miller v. Department of Corrections* (2005) 36 Cal.4th 446, 460.)

**B. Evidentiary Rulings**

H.N. challenges the trial court's exclusion of some of the evidence that he presented and the denial of his request to take judicial notice of several documents. Reviewing these rulings for abuse of discretion (*Nazir v. United Airlines, Inc.* (2009) 178 Cal.App.4th 243, 255, fn. 4; *Mackey v. Bd. of Trustees of California State University* (2019) 31 Cal.App.5th 640, 657), we conclude that there was no abuse.

*1. The Babich Declaration*

In opposing summary judgment, H.N. sought to introduce a declaration from an immuno-pharmacologist, Dr. Michael Babich, concerning the efficacy of masking for children, transmission of the SARS-CoV-2 virus, and the validity of COVID-19 testing. H.N. contends that Dr. Babich's declaration was relevant to whether the protocols used by the District had a sound scientific basis and thus were adopted with "due care." However, as H.N. recognizes in his opening brief, these protocols were formulated by county and state public health officials, not Defendants. In addition, as the trial court observed, the Babich Declaration, which was submitted in June 2024, presented "hindsight opinion" based, among other things, on a "[r]recently" conducted "meta-analysis" of measures taken to mitigate the spread of COVID-19. In his declaration, Dr. Babich does not offer any opinions concerning the scientific knowledge available in early 2022 when the actions at issue in this case were taken. Consequently, the opinions in the Babich Declaration shed little light on whether there was a sound basis in early 2022 for the protocols that the District followed, much less whether the District acted

11

unreasonably or without due care in following them. We therefore conclude that Dr. Babich's opinions are not relevant either to H.N.'s negligence claim or to the immunity defenses of the District, Superintendent Krause, and Principal Wahl.

H.N. also asserts that the Babich Declaration is relevant to whether Defendants had a lawful privilege to isolate H.N. However, H.N. fails to offer any explanation for this assertion, and we therefore treat it as abandoned. (*In re Phoenix H.* (2009) 47 Cal.4th 835, 845 (*Phoenix*) [" ' "Contentions supported neither by argument nor by citation of authority are deemed to be without foundation and to have been abandoned." ' "].)

### 2. *The Burgess Declaration*

H.N. also challenges exclusion of the declaration of Catherine Burgess, H.N.'s therapist. H.N. asserts that the Burgess declaration contained "clinically grounded descriptions of H.N.'s trauma based on her direct interactions with and treatment of H.N., opining, for instance, that his experience of isolation was 'akin to punitive solitary confinement' and would foreseeably cause 'significant emotional distress and potential psychological harm,' potentially leading to 'lasting emotional harm.' " Because Burgess' opinions are based upon her "percipient observations and clinical judgment," H.N. contends that they are admissible lay—but, notably, not expert—opinion.

We are unable to evaluate this assertion because, unlike Dr. Babich's declaration, the Burgess declaration is not included in the record. As the Supreme Court has admonished, "it is a fundamental principle of appellate procedure that a trial court judgment is ordinarily presumed to be correct and the burden is on an appellant to demonstrate, on the basis of the record presented to the appellate court that the trial court committed an error that justified reversal of the judgment." (*Jameson v. Desta* (2018) 5 Cal.5th 594, 608-609 (*Jameson*).) " ' "A necessary corollary to this rule is that if the record is inadequate for meaningful review, the appellant defaults and the decision of the trial court should be affirmed." ' " (*Ibid*.) Because H.N. has not included the Burgess

12

Declaration in the record, we conclude that he has failed to show that the trial court abused its discretion in excluding the declaration.

### 3. Lay Witness Opinions

H.N. submitted declarations from both of his parents and a neighbor. The trial court excluded seven paragraphs from these declarations. Although H.N. contends that all of these exclusions were improper, he discusses only one: the exclusion of paragraph 12 from the declaration of his father. According to that paragraph and the photograph accompanying it, on March 17, 2023 the father's car was pulled over by the police, who drew their weapons on him. In addition to describing this event, H.N.'s father states "I believe that this result was a result of the communication between Tanya Krause and Chief Walpole in their efforts to weaponize the agents of the state against me under the color of the law." However, the declaration offers no foundation for that belief, and while H.N. asserts that the father's assertion was "grounded in his perception," he fails to explain what that perception was. We therefore conclude that there was no abuse of discretion in excluding this paragraph or the other paragraphs from his declaration and those of H.N.'s mother and their neighbor.

### 4. Requests for Judicial Notice

Finally, H.N. argues that the trial court should have granted his request to take judicial notice of two recalls of SARS-CoV-2 tests. H.N. contends that the trial court should have taken judicial notice of the recalls because they are relevant to the reasonableness of the testing protocols that H.N. was punished for not following. However, the District did not formulate the protocols that it adopted, and the recalls of the tests, one of which occurred in April 2022 after adoption of the protocols, shed no light on the reasonableness of either the decision to adopt the protocols or implementation of that decision.

Consequently, we conclude that the trial court did not abuse its discretion either in excluding evidence or in denying judicial notice.

13

## C. .Governmental Immunity

Turning to the merits, we first consider governmental immunity. The trial court held that three of the Defendants—the District, Superintendent Krause, and Principal Wahl—were immune to H.N.'s claims as a matter of law under two sets of provisions: (1) the general immunity of public employees for discretionary decisions under section 820.2 and the related immunity for their employers under section 815.2; and (2) the specific immunity for public health efforts to control the communication of disease under section 855.4. H.N argues that these rulings were erroneous, among other things, because the defendants in question did not draft the policies they enforced and therefore did not exercise discretion protected by the immunity statute, and also because the CDPH guidance followed was improperly issued and not binding. We need not reach these arguments because under section 855.4, even when carrying out plans to prevent the communication of disease formulated by others, public entities and employees are immune from liability so long as they act with due care, and H.N. has failed to raise a triable issue whether the District, the superintendent, and the principal failed to exercise due care.

Section 855.4 confers two types of immunity. First, the section confers absolute immunity upon public entities and public employees exercising discretionary authority to control the communication of disease: "Neither a public entity nor a public employee is liable for an injury resulting from the decision to perform or not to perform any act to promote the public health of the community by preventing disease or controlling the communication of disease within the community if the decision whether the act was or was not to be performed was the result of the exercise of discretion vested in the public entity or the public employee, whether or not such discretion be abused." (§ 855.4, subd. (a).) Second, section 855.4 confers qualified immunity upon public entities and public employees carrying out discretionary decisions concerning the control of the communication of disease so long as they act with due care: "Neither a public entity nor

14

a public employee is liable for an injury caused by an act or omission in carrying out with due care a decision described in subdivision (a)." (*Id.*, § 855.4, subd. (b).)

H.N. does not dispute that, in performing the actions he challenges, the District, the superintendent, and the principal were carrying out decisions concerning control of the communication of COVID-19 and therefore protected by qualified immunity under subdivision (b) of section 855.4. (See *Allos v. Poway Unified School Dist.* (2025) 112 Cal.App.5th 822, 834-835 [school district immune under section 855.4 for decisions regarding COVID-19 protocols].) To the contrary, H.N. asserts that he presented evidence that the defendants were "carrying out directives and mandates imposed by the CDPH and the County Office of Education," and that each of the acts that he challenges was "a ministerial or operational implementation of broader health guidance" or "rote enforcement of externally mandated guidelines."

Instead, H.N. argues that he presented evidence raising a triable issue whether the District, the superintendent, and the principal acted with due care. In particular, H.N. asserts that "[t]he acts complained of—namely, the prolonged isolation of a six-year-old child in a shuttered 'storage room,' his exclusion from academic instruction, his subjection to unfamiliar substitutes, and his segregation from his peers—bore all the indicia of arbitrary, punitive conduct, not acts of due care." However, the only evidence that H.N. cites in support of this assertion is a paragraph from his declaration and the declaration from his therapist. This evidence is insufficient. First, as noted above, the therapist's declaration, which the trial court excluded, was not included in the record on appeal and therefore cannot be considered. (*Jameson*, *supra*, 5 Cal.5th at p. 609.) Second, while H.N.'s declaration states that he was placed in an abandoned classroom used for storage with a substitute, that he was not allowed to eat or play with his friends, and that he was forced to run laps during recess, he fails to explain how that evidence shows that defendants did not implement COVID-19 protocols with due care.

15

Such cursory argument cannot establish reversible error. As noted above, "a trial court judgment is ordinarily presumed to be correct and the burden is on an appellant to demonstrate . . . that the trial court committed an error that justifies reversal of the judgment." (*Jameson*, *supra*, 5 Cal.5th at p. 609.) In addition, the California Rules of Court "expressly require appellate briefs to '[s]tate each point . . . and support each point by argument and, if possible, by citation of authority' and to '[s]upport any reference to a matter in the record by a citation to the volume and page number of the record where the matter appears.' " (*L.O. v. Kilrain* (2023) 96 Cal.App.5th 616, 620.) Consequently, where, as here, a party fails to support a point with reasoned argument or authority, that point is deemed forfeited or abandoned. (See *Phoenix*, 47 Cal.4th at p. 845; see also *Delta Stewardship Council Cases* (2020) 48 Cal.App.5th 1014, 1075 (*Delta Stewardship*) ["When an appellant . . . fails to support [a point] with reasoned argument and citations to authority, we treat the point as forfeited."]; *In re S.C.* (2006) 138 Cal.App.4th 396, 408 (*S.C.*) ["To demonstrate error, appellant must present meaningful legal analysis supported by citations to authority and citations to facts in the record that support the claim of error."].)

We therefore conclude that governmental immunity under section 855.4, subdivision (b) protects the District, Superintendent Krause, and Principal Wahl, H.N has failed to demonstrate any triable issue concerning due care, and therefore the District, the superintendent, and the principal are entitled to judgment as a matter of law on the claims against them.

### D. Individual Claims

We now turn to H.N.'s individual claims, which were asserted against his teacher Gelter as well as the principal, the superintendent, and (with one exception) the District.

#### 1. False Imprisonment

H.N.'s first claim was for false imprisonment. The trial court granted summary judgment to Defendants on this claim, reasoning that Defendants had a lawful privilege to

16

segregate H.N. when he came to school without complying with masking and testing requirements. H.N. argues that he presented evidence raising a triable issue concerning the lawfulness of his confinement. As explained below, we disagree.

False imprisonment has three elements: "(1) the nonconsensual, intentional confinement of a person, (2) without lawful privilege, and (3) for an appreciable period of time, however brief." (*Easton v. Sutter Coast Hosp.* (2000) 80 Cal.App.4th 485, 496 (*Easton*).) Thus, confining a person to a particular place is not false imprisonment unless the confinement was without lawful privilege, that is, " 'without valid legal authority.' " (*Asgari v. City of Los Angeles* (1997) 15 Cal.4th 744, 757; see, e.g., *Easton*, at p. 496 [finding lawful privilege for removal to hospital based on statute authorizing protective custody].) As the Supreme Court has recognized, because " '[a] proper educational environment requires close supervision of schoolchildren,' " public schools exercise " 'custodial and tutelary' " power over their students. (*Vernonia School Dist. 47J v. Acton* (1995) 515 U.S. 646, 655.) This power gives schools a " 'degree of physical control . . . to maintain order, protect property, or protect the health and safety of pupils,' " which authorizes schools to tell students "to remain in or leave a classroom" or "to go to a particular classroom." (*In re Randy G.* (2001) 26 Cal.4th 556, 563.)

The acts about which H.N. complains—confining him in an unused classroom being used as "storage space," denying him instruction, and forcing him to eat and exercise alone—fall squarely within the recognized authority of schools to supervise students and determine their location on campus. Citing *People v. Apo* (1972) 25 Cal.App.3d 790 (*Apo*), H.N. contends that this authority does not extend to acts "undertaken in a punitive, unreasonable, or unlawful manner." However, in *Apo*, kidnapping charges were brought *against* college students who marched the director of athletics, a professor, and an administrator into a building and held them there for hours. (*Id.* at pp. 793-795.) As a consequence, it sheds no light on the authority of an elementary school to determine where to place a student.

17

In his reply brief, H.N. also asserts that Defendants exceeded their lawful privilege by not individually assessing him for health risk. However, the case he cites—*Abella v. Riverside Unified School District* (1976) 65 Cal.App.3d 153—concerned an exemption from the state's compulsory education requirements (*id.* at p. 157), not a false imprisonment claim, and is inapposite—as are his citations to *In re Gault* (1967) 387 U.S. 1, concerning due process rights, and *Tinker v. Des Moines Independent Community School District* (1969) 393 U.S. 503, concerning freedom of expression.

Even more important, H.N. fails to explain how Defendants acted in a punitive, unreasonable, or unlawful manner. Although H.N. asserted at oral argument that he was placed in a storage closet, he acknowledged in his declaration that in fact he was placed in a classroom that was being used to store various items. Moreover, Defendants presented uncontroverted photographic evidence of the classroom in question, which shows a spacious, fully furnished classroom with tables, chairs, bookshelves, whiteboards, posters, and a brightly colored mat. No reasonable jury could find that confinement to such a classroom was punitive or unreasonable. Moreover, while H.N. asserts that it was unreasonable to isolate him in this room with a substitute, he does not offer any meaningful legal analysis or authority in support for this assertion, which therefore fails to show any reversible error. (*Phoenix*, *supra*, 47 Cal.4th at p. 845; *Delta Stewardship*, *supra*, 48 Cal.App.5th at p. 1075; *S.C.*, *supra*, 138 Cal.App.4th at p. 408.)

H.N.'s averment that the substitute teacher or teachers provided him in the unused classroom failed to teach him anything is troubling. However, H.N. has not explained how the failure to teach him raises a triable issue concerning whether Defendants had a lawful privilege to place him in the unused classroom.

We therefore conclude that H.N. failed to raise a triable issue concerning false imprisonment and Defendants are entitled to judgment as a matter of law on that claim.

## 2. *Negligence*

In addition to contending that the trial court erred in entering summary judgment on his false imprisonment claim, H.N. contends that the court erred in finding no triable issue concerning breach in connection with his negligence claim. Relying once again on the declaration from his therapist, H.N. asserts that it was "psychologically damaging and developmentally inappropriate" to place him in an unused classroom filled with stacked furniture and cleaning supplies, blinds drawn, and no meaningful instruction and forcing him to eat and exercise alone. This argument fails because, as noted above, the therapist's declaration was excluded and not included in the record on appeal.

In addition, while, as noted above, H.N.'s accusation that he did not receive meaningful instruction is troubling, Defendants presented uncontroverted evidence that the District retained substitute teachers "to provide . . . education to Plaintiff," and that his regular teacher prepared work packets, which H.N. acknowledged that he received. Moreover, H.N. failed to offer any evidence that Defendants breached any applicable standard of care by failing to recognize that the substitutes were not teaching H.N. Indeed, H.N. did not even present any argument or authority suggesting that public schools have an actionable duty to provide adequate instruction, which is by no means clear. (See *Campaign for Quality Education v. State of California* (2016) 246 Cal.App.4th 896, 906 [no judicially enforceable right under the California Constitution to an "education of some quality"]; *Keech v. Berkeley Unified School Dist.* (1984) 162 Cal.App.3d 464, 468 [no common law duty to provide general education services]; *Peter W. v. San Francisco Unified School Dist.* (1976) 60 Cal.App.3d 814, 817-825 [no actionable duty to instruct under *Rowland v. Christian* (1968) 69 Cal.2d 108].)

H.N. also asserts that Defendants provided a damaging and inappropriate environment based on two decisions. Neither supports H.N. One decision held that a school owed a duty to protect a special education student from sexual assault at the school prior to the beginning of class. (See *M.W. v. Panama Buena Vista Union School*

19

*Dist.* (2003) 110 Cal.App.4th 508, 511.)  The other decision held that a school had a duty to protect a "special needs" student from assault by other students and that the student had raised a triable issue whether the school breached that duty.  (*Jennifer C. v. Los Angeles Unified School Dist.* (2008) 168 Cal.App.4th 1320, 1326-1333.)  Neither decision sheds light on whether Defendants provided a damaging or inappropriate environment to H.N. or in any way suggests that there is a triable issue concerning negligence.  In his reply, H.N. asserts for the first time that the District could have considered alternative accommodations such as outdoor instruction, plexiglass barriers, or remote learning support.  However, we do not consider arguments raised for the first time on reply.  (See, e.g., *Allen v. Sacramento* (2015) 234 Cal.App.4th 41, 52.)

Finally, H.N. asserts that Defendants were negligent in excluding him from an after-school program and leaving him alone at the pickup curb.  Citing *Patterson v. Sacramento City Unified School District* (2007) 155 Cal.App.4th 821 (*Patterson*), H.N. asserts that "[s]uch a lapse constitutes a patent failure of supervision."  However, *Patterson* did not involve supervision of school children:  Quite the contrary, it held that a school district offering an adult truck driver training course owed the students a duty to instruct the students on the proper technique for loading and unloading flatbed trucks and trailers.  (*Id.* at pp. 828-829.)  H.N. does not explain how that decision suggests any negligence in this case.  In addition, his unexplained assertion that there was a "patent failure of supervision" provides no basis for overturning the trial court's decision.  (See, e.g., *Osgood v. Landon* (2005) 127 Cal.App.4th 425, 435 ["conclusionary assertions are wholly inadequate to tender a basis for relief on appeal"].)

Accordingly, we conclude that summary judgment was properly entered on H.N.'s negligence claim.

### 3.  *Intentional Infliction of Emotional Distress*

In addition to claiming false imprisonment and negligence, H.N. claimed intentional infliction of emotional distress.  To prove a claim for intentional infliction of

emotional distress, a defendant must establish three elements: "(1) extreme and outrageous conduct . . . with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) . . . severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the . . . outrageous conduct." (*Miller v. Fortune Commercial Corp.* (2017) 15 Cal.App.5th 214, 228-229 (*Miller*).) The trial court ruled that H.N. failed to raise a triable issue concerning intentional infliction of emotional distress because he failed to present evidence of extreme and outrageous conduct. H.N contends that he presented evidence of three separate instances of extreme and outrageous conduct. As explained below, here again, we disagree.

      a.  Isolation

H.N. contends that H.N.'s "repeated isolation and solitude" for three days in late January and early February 2022 and for 12 more days in late February and early March 2022 qualifies as outrageous conduct. However, for purposes of a claim for intentional infliction of emotional distress, outrageous conduct is conduct "so extreme as to exceed all bounds of that usually tolerated in a civilized community." (*Davidson v. City of Westminster* (1982) 32 Cal.3d 197, 209.) Such conduct must be " 'of a nature which is *especially calculated to cause*, and does cause, mental distress of a very serious kind.' " (*Ochoa v. Superior Court* (1985) 39 Cal.3d 159, 165, fn. 5.) Other than once again citing to the declaration of H.N.'s therapist that was excluded by the trial court and not included in the record on appeal, H.N. offers no reason why placement of H.N. in an unused classroom with a substitute was so extreme as to exceed all bounds of what is usually tolerated in civilized society, especially as Principal Wahl offered to allow H.N. to stay home instead.

      b.  The "End This Nonsense" Sign

H.N. also contends that Defendants engaged in outrageous conduct when they confiscated his protest sign. In support of this contention, H.N. cites two paragraphs

from his declaration and a page from the deposition of his teacher Gelter. However, one of the cited declaration paragraphs does not concern the protest sign, and the other merely states that, when he held up a sign saying "End this Nonsense," his teacher grabbed it out of his hand and sent him to the office. Moreover, in her deposition, the teacher said that she did not take the sign and send H.N. to the office until the whistle had blown and the students were lining up to go back to the classroom. Even viewing this evidence in the light most favorable to H.N., this conduct was not so extreme as to exceed all bounds tolerated in civilized society. In addition, H.N. fails to offer any reasoned argument or authority to the contrary and thus has forfeited or abandoned this issue. (*Phoenix*, *supra*, 47 Cal.4th at p. 845; *Delta Stewardship*, *supra*, 48 Cal.App.5th at p. 1075; *S.C.*, *supra*, 138 Cal.App.4th at p. 408.)

Finally, H.N. asserts that "his attempts to speak about the manner in which the school had treated him were met with reprimand." However, H.N. does not cite any evidence in support of this assertion, and he once again fails to offer any reasoned argument or authority in support of his contention that such conduct qualifies as outrageous.

c. Contacts with the Police and Child Protective Services

Finally, H.N. contends that it was outrageous for Defendants to use law enforcement and child protective services to coerce him. However, the evidence cited by H.N. does not show that Defendants actually called child protective services: Instead, it shows that the District considered contacting child protective services but decided not to do so. H.N. does point to deposition testimony by Superintendent Krause that the District called the police concerning H.N.'s father. However, Krause testified that this call occurred in September 2022, and there is no evidence that this contact was ever communicated to H.N., much less that he suffered emotional distress as a result of it. As a consequence, there is no evidence that this conduct was intended to cause emotional distress, much less that it did so, and therefore the conduct does not raise a triable issue

22

concerning either the first or third elements of a claim for intentional infliction of emotional distress. (*Miller*, *supra*, 15 Cal.App.5th at pp. 228-229.)

We therefore conclude that summary judgment for Defendants was properly entered on H.N.'s claim for intentional infliction of emotional distress.

### 4. Bane Act

The trial court granted summary judgment on H.N.'s claim under the Bane Act (Civil Code § 52.1) for much the same reason as the intentional infliction of emotional distress claim: H.N. failed to present evidence of the conduct required for such a claim. While the Bane Act does not require extreme and outrageous conduct, it requires intentional interference or attempted interference with a legal or constitutional right " 'by threats, intimidation or coercion.' " (*Wiley v. Kern High School Dist.* (2024) 107 Cal.App.5th 765, 774; see also Civ. Code, § 52.1, subd. (a) [authorizing civil action if a person "interferes by threat, intimidation, or coercion, or attempts to interfere by threat, intimidation, or coercion" with the exercise or enjoyment of constitutional rights].) Here again, H.N. contends that he raised a triable issue based on evidence of communications with the police, consideration of contacting child protective services, and confiscation of H.N.'s sign. And, here again, we disagree.

In contending that Defendants interfered with his rights by threat, intimidation, or coercion, H.N. notes that "Superintendent Krause herself communicated directly with the Scotts Valley Chief of Police." However, this evidence merely shows that Krause told the police chief that H.N.'s father was making threats, including to record the principal sending his child home for refusing testing. Moreover, H.N. fails to explain how this evidence suggests that Defendants intended to interfere or attempt to interfere with H.N.'s exercise of constitutional rights. Instead, H.N. asserts that "[s]uch an act . . . is inherently intimidating" without explanation or authority, which, as noted above, is insufficient on appeal. (*Phoenix*, *supra*, 47 Cal.4th at p. 845; *Delta Stewardship*, *supra*, 48 Cal.App.5th at p. 1075; *S.C.*, *supra*, 138 Cal.App.4th at p. 408.)

23

H.N. also asserts that his father was stopped by a police officer who drew a gun and pointed it at him. However, according to the evidence that H.N. cites, this incident occurred in March 2023, long after any of the other incidents alleged in the complaint. Moreover, while H.N.'s father asserted in a declaration that "I believe that this . . . was a result of the communication between Tanya Krause and Chief Walpole in their efforts to weaponize the agents of the state against me under the color of the law," he failed to offer any foundation for that belief, which is presumably one of the reasons why the trial court excluded this portion of the declaration.

In addition to pointing to Superintendent Krause's communications with the Chief of Police, H.N. notes that the superintendent spoke with county officials about contacting child protective services. However, as discussed above, there is no evidence that Defendants actually contacted child protective services. Nor is there any evidence that H.N. or his family were told that such a contact might be made. As a consequence, the evidence that the superintendent considered contacting child protective services does not raise any triable issue concerning threats, intimidation, or coercion by Defendants.

Finally, H.N. asserts that "suppression of H.N.'s speech through confiscation of his sign and disciplinary removal (making him 'sad and a little scared') was itself coercive" as was the "pattern of escalation" of "retaliatory punishment for exercising first amendment rights." Because H.N. offers no argument or authority in support of this assertion, it fails to demonstrate any error. (*Phoenix*, *supra*, 47 Cal.4th at p. 845; *Delta Stewardship*, *supra*, 48 Cal.App.5th at p. 1075; *S.C.*, *supra*, 138 Cal.App.4th at p. 408.)

Accordingly, we conclude that summary judgment for Defendants was properly entered on H.N.'s Bane Act claim.

### 5. *Constitutional Claims*

H.N.'s final claim is that Superintendent Krause, Principal Wahl, and his teacher Gelter violated his rights under the First and Fourteenth Amendments to the United States Constitution; Article I, section 2(a) of the California Constitution; and Education Code

section 48907, subdivision (a). In granting summary judgment on this claim, the trial court noted that H.N. had not argued in his opposition brief that there was any triable issue concerning such violations; instead, he argued that the CDPH guidelines followed by the District were not binding because the department had not followed the APA (§ 11340 et seq.) in promulgating the guidelines. The trial court rejected this argument on the ground that the Governor had suspended the APA with respect to COVID-19 regulations pursuant to the Emergency Services Act (§ 8850 et seq.).

On appeal, H.N. does not challenge this ruling. Instead, he argues that Defendants violated, among other things, his right to free expression under the First Amendment to the United States Constitution, his Fourteenth Amendment rights to due process and equal protections, and Education Code section 48907 as well as what he asserts is the right to "in-person" education under the California Constitution. Because these arguments were not raised in the trial court, we deem them forfeited. (See, e.g., *Hewlett-Packard Co. v. Oracle Corp.* (2021) 65 Cal.App.5th 506, 548 [" ' "As a general rule, theories not raised in the trial court cannot be asserted for the first time on appeal . . . ." ' "]; see also *Souza v. Westlands Water Dist.* (2006) 135 Cal.App.4th 879, 899 [" 'we have an obligation to avoid deciding constitutional questions unless it is absolutely necessary to do so' "].)

We therefore conclude that summary judgment for Defendants was properly granted on H.N.'s constitutional claims as well as his other claims.

### III. DISPOSITION

The judgment is affirmed. Respondents are entitled to recover their costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1).)

25

_____
BROMBERG, J.

WE CONCUR:


_____
GREENWOOD, P. J.


_____
DANNER, J.


*H.N. v. Scotts Valley Unified School District et al.*
H052568